JOSÉ CAPÓ CABALLERO, demandante y recurrente, *v.*
ÁNGEL RAMOS, demandado y recurrido.

*Numero:* 12021. *Resuelto:* 6 de octubre de 1961.

*Félix Ochoteco, Jr.* y *Enrique Igaravidez,* abogados del recurrente; *Brown, Newsom & Córdova,* abogados del recurrido.

Sala integrada por el Juez Asociado señor Belaval, como Presidente de Sala, y los Jueces Asociados señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

Se trata de una acción sobre cumplimiento específico de contrato y otros extremos. En 1ro. de agosto de 1952 el demandante José Capó Caballero y el Lcdo. José G. González,

en representación del demandado Angel Ramos, firmaron el siguiente documento redactado en inglés, que vertemos al castellano:

"OPCIÓN

Por y en consideración a la suma de cien con 00/100 Dólares ($100.00), que me fue pagada de contado el veinticuatro de junio, 1952, por la presente concedo a—Angel Ramos—una opción de compra de no menos de 5.1 cuerdas a ser segregadas de mi finca de 151.13 cuerdas situada en el barrio Hato Nuevo, Guaynabo, Puerto Rico, cerro conocido como 'La Marquesa'.

"Dichas 5.1 cuerdas se comprarán en un solo predio incluyendo el punto más alto obtenible [available] en mi referida finca, y por el precio de quinientos con 00/100 dólares ($500.00) por cuerda, no más tarde del veinticuatro de agosto, 1952, en ocasión de lo cual el monto pagado por esta opción se acreditará al precio de compra. Si el aceptante dejare de ejercer la opción, la cantidad pagada se retendrá por el oferente en pago total de daños líquidos.

"En caso de que el aceptante hiciere uso de su derecho a comprar el referido predio:

(a) Se mensurará el predio y se localizará la parcela vendida por acuerdo entre el oferente y el aceptante, y dicho predio incluirá el punto más alto en el referido cerro 'La Marquesa'.

(b) El aceptante: (1) construirá a expensas suyas y mantendrá una carretera pavimentada con suficiente ancho para el tránsito de vehículos de motor en ambas direcciones, hasta su referido predio, pasando por aquellas partes de la finca del oferente que el oferente determinare; (2) extenderá las líneas de energía y de alumbrado hasta su parcela a su costo, y (3) dispondrá para su propio depósito y sistema de distribución de agua.

(c) El uso de todas las obras construidas bajo el párrafo (b) anterior quedará disponible al oferente, sus sucesores o cesionarios, sin cargo alguno.

"Nada de lo aquí convenido limitará el derecho del oferente a disponer de cualquier otra porción de su finca para fines similares a aquéllos para los cuales el aceptante desea el predio objeto de esta opción.

"El aceptante comenzará su carretera pavimentada empezando en la terminación de la actual carretera privada del ofe-

rente, y conservará bien pavimentada y en buenas condiciones transitables dicha carretera privada del oferente hasta la intersección con la carretera estatal de Aguas Buenas en el Km. 4.7 reparando, a tal fin, puentes, alcantarillas, cunetas, zanjas de desagües, etc., a expensas suyas, sin obligación alguna por parte del oferente de contribuir a dicha conservación.

"La opción se concede al aceptante para el fin exclusivo de que construya una torre de televisión y las obras necesarias para la explotación de una estación emisora de televisión.

"Términos y condiciones adicionales no incompatibles con lo anterior serán concertados entre el oferente y el aceptante al otorgarse la correspondiente escritura.

"Esta opción reemplaza y anula la opción concedida al Sr. Angel Ramos sobre esta misma porción de terreno, fechada junio 24, 1952.

"Agosto 1, 1952, San Juan, Puerto Rico, (Firmado) : J. Capó Caballero, oferente. (Firmado) Angel Ramos, por José E. González."

La opción de 24 de junio de 1952 a que hace referencia la anterior se redactó en términos casi idénticos, salvo el hecho de que fue firmada únicamente por Capó Caballero.

En 22 de agosto de 1952 J. Oviedo en su capacidad de apoderado de Angel Ramos envió una carta al demandante en los siguientes términos: (traducida)

"Por y a nombre del Sr. Angel Ramos por la presente hago uso de su opción de comprar ciertos terrenos que usted posee situados en el barrio Hato Nuevo, Guaynabo, Puerto Rico, bajo los términos y condiciones de la opción que usted le concediera al Sr. Angel Ramos en 1ro. de agosto, 1952. La presente constituirá, por lo tanto, un contrato obligatorio entre las partes que será evidenciado por escritura pública a ser otorgada por usted y el Sr. Ramos o su representante.

"El Sr. José G. González, abogado del Sr. Angel Ramos, está al presente en los Estados Unidos. A su regreso, que será antes del 30 de este mes, él preparará las escrituras para el traspaso e inmediatamente después se le avisará a usted que están listas para su firma. (firmado) : J. Oviedo, apoderado del Sr. Angel Ramos."

Con esta carta se acompañó un cheque a favor del demandante cubriendo el balance de la venta, en adición a la suma de $100 entregada al firmarse la opción original.

En 30 de junio de 1953, casi un año más tarde, el demandante requirió por escrito del demandado el cumplimiento del contrato, y a fin de facilitar el otorgamiento acompañó un proyecto de escritura preparada por su abogado. En el referido proyecto comparecían ambos, el demandante y su esposa como vendedores, se transcribía literalmente la opción, se describía la finca y la parcela a ser vendida, expresando los esposos vendedores que ésta comprendía el punto más alto que ellos poseían en su finca descrita y en la ladera nordeste del cerro conocido por "La Marquesa". También se hacía referencia a las obras que de acuerdo con la opción el demandado debía construir y conservar. La anterior comunicación no fue contestada. En 16 de octubre de 1953 el Lcdo. González, abogado del demandado, escribió al abogado del demandante manifestándole que su cliente adoptaba la posición de que él hizo uso de la opción a base de representaciones erróneas, y que por lo tanto resultaba improcedente, debiendo el Sr. Capó restituirle lo pagado.

Todos los anteriores hechos alegados se admitieron en la contestación. Otros fueron negados. El demandado levantó varias defensas especiales, entre ellas, la de que él prestó su consentimiento por error porque tuvo el propósito y así lo había expresado al demandante, de adquirir una parcela de 5.1 cuerdas en el punto más alto del cerro conocido con el nombre de "La Marquesa", independientemente de quién fuera el dueño de dicho punto, y que al negociar con el demandante lo hizo bajo la creencia, inducida por éste, de que la finca del demandante comprendía el punto más alto del cerro "La Marquesa"; que no fue hasta después de suscrita la opción que el demandado se enteró que la finca del demandante no llegaba al punto más alto del cerro "La Marquesa", y que prestó su consentimiento habiendo mediado dolo por parte

del demandante porque a través de palabras, representaciones y maquinaciones insidiosas le indujo a creer, sabiendo que no era cierto, que su finca comprendía terrenos llanos en el punto más alto de una finca conocida como "La Marquesa"; que la parcela a ser segregada comprendía el punto más alto del cerro "La Marquesa" sin que hubiese terreno colindante de altura mayor, y serviría para el propósito del demandado de construir una torre de televisión. Además, el demandado interpuso contrademanda reclamando la devolución de $2,500 pagados.

Entre las conclusiones de hecho que hizo la Sala sentenciadora, aparecen las siguientes:

(1) Que el demandado, interesado en obtener un sitio adecuado para la construcción de una torre de televisión y edificio accesorio, instruyó en junio de 1952 a su empleado el ingeniero Angel del Valle para que inspeccionara el cerro "La Marquesa" en la jurisdicción de Guaynabo o Aguas Buenas y le informara si su altura y localización lo hacían recomendable para allí construir la torre y edificio de la estación televisora. En el mismo mes de junio el ingeniero del Valle llevó a efecto la encomienda y sin subir a la cumbre observó el cerro "La Marquesa" estudiándolo en relación con su ubicación geográfica y altura superior a los demás cerros de la demarcación. Habiendo recibido la información suministrada por el ingeniero del Valle y entendiendo que el demandante Capó Caballero era el dueño de la altillanura o mesa del cerro "La Marquesa" que resultaba ser el más alto, el demandado en junio de 1952 comisionó a Manuel del Valle, amigo de ambas partes y hermano del ingeniero, para que hiciera contacto con Capó con miras a la posibilidad de adquirir una parcela de terreno en la citada altillanura del cerro "La Marquesa" para la construcción de la torre y edificio. Manuel del Valle hizo el contacto solicitado y el demandante se mostró inclinado a vender el terreno necesario a razón de $500 la cuerda y otras consideraciones. El de-

mandante y su esposa eran dueños de una finca de más de 100 cuerdas en aquella demarcación en donde está el cerro "La Marquesa". Este tiene en su cumbre una mesa o altillanura.

(2) Que en junio de 1952 el ingeniero del Valle informó al demandante que Ramos interesaba alrededor de cinco cuerdas llanas o semillanas en el punto más alto del cerro "La Marquesa" para la torre de televisión y el demandante redactó una opción por sesenta días en consideración a la suma de $100, y que en 24 de junio de 1952 el demandado aceptó el contrato.

(3) Que antes de firmarse el contrato de opción del 1ro. de agosto de 1952 y antes de hacerse uso de tal opción por el demandado, éste había comprobado por mediación del U. S. Geodetic Survey que el cerro "La Marquesa" en donde existía en su cima una altillanura era el punto más alto de la zona, y que en la solicitud de permiso para construir la estación el demandado informó a la Autoridad de Comunicaciones Federal que la torre y su edificio accesorio se construiría en tal sitio.

(4) Que para agosto 9 de 1952, antes de hacer uso el demandado del derecho de opción de primero de agosto, el ingeniero del Valle y el abogado José G. González en representación del demandado fueron a la finca del demandante y acompañados por éste a fin de que del Valle fuera al sitio donde Capó habría de segregar las 5.1 cuerdas referidas en la opción. Concluyó el Tribunal:

. . . ."Estas tres personas penetraron en automóvil en la finca del demandante y continuaron por ella hasta un sitio donde el camino terminaba y de ahí en adelante el ingeniero del Valle continuó a pie con el demandante y luego de haber subido por algún tiempo hacia la cumbre del cerro La Marquesa se detuvieron sin haber alcanzado su cima. El señor Capó señaló a del Valle desde el sitio donde estaban el punto más alto del cerro donde precisamente está la mesa o altillanura que hemos mencionado antes, indicándole que era allí donde se encontraban

las 5.1 cuerdas a ser adquiridas por el demandado don Angel Ramos. Como llovía retornaron al sitio donde habían dejado en el automóvil al Lic. González. Estima el tribunal que tanto el ingeniero del Valle como el abogado González, de la entrevista y cambio de impresiones que en ese tuvieron con el demandante, dedujeron y creyeron que las 5.1 cuerdas que iba el demandado a adquirir ubicaban en la mesa o altillano del cerro La Marquesa y que era el demandante señor Capó, el dueño de tales terrenos. El demandante no dijo ni hizo nada en aquella entrevista que fuera inconsistente con esa impresión."

(5) Que en abril de 1953, y en un almuerzo, las partes y sus abogados se manifestaron satisfechas de lo acordado o aparentemente acordado. En mayo de 1953 el ingeniero Rafael Delgado Márquez entró a servir al demandado como Administrador de la estación televisora y Delgado Márquez se comunicó con el demandante, le pidió un plano de su finca y se le entregó uno viejo que tenía; con dicho plano y la solicitud de construcción ante la Autoridad de Comunicaciones Federal fue al cerro "La Marquesa" a inspeccionar y localizar el sitio, ascendiendo, no por los terrenos del demandante sino por terrenos colindantes pertenecientes al Lcdo. Jorge Ortiz Toro, y al llegar al sitio de referencia se dio cuenta que las altillanuras estaban fuera de los terrenos del demandante y quedaban dentro de los terrenos del Lcdo. Ortiz Toro. Se dio cuenta Delgado Márquez que los terrenos del demandante más cercanos a la cima de "La Marquesa" colindaban por el norte con la altillanura y dichos terrenos, en vez de ser en aquel sitio llanos o semillanos, se precipitaban en un ángulo de aproximadamente cuarenta y cinco grados y determinó que sería económicamente prohibitiva la construcción de la torre y edificio en los terrenos adyacentes a la cima del cerro que pertenecían al demandante.

(6) Que el ingeniero Delgado Márquez informó al demandante del error en cuanto a la localización de las 5.1 cuerdas semillanas en el cerro "La Marquesa" y que el demandante insistió que él no había ofrecido las 5.1 cuerdas

en la cima o punto más alto del cerro "La Marquesa" sino en el punto más alto de su finca que formaba parte del cerro "La Marquesa".

(7) Que el demandado arrendó al Lcdo. Ortiz Toro por 99 años las referidas 5.1 cuerdas semillanas en la cumbre del cerro "La Marquesa" y construyó allí la torre y el edificio accesorio para la estación. La torre, si bien no se construyó en el punto más alto de las 5.1 cuerdas arrendadas al Lcdo. Ortiz Toro, se construyó en un punto que era para todos los fines prácticos de igual altura seleccionado por Delgado Márquez como el mejor dentro de las circunstancias.

(8) Concluyó además la Sala que como cuestión realista el demandante no era dueño de los terrenos semillanos en la cima del cerro "La Marquesa" y sí de los terrenos colindantes los cuales, por su topografía, no servían para la construcción de una torre de televisión y edificio; que el demandado hizo uso de la opción del 1ro. de agosto de 1952 y aceptó los términos de dicha opción en la *creencia errónea* de que el objeto del contrato, los terrenos, estaban localizados en el punto más alto del cerro "La Marquesa", y que dichos terrenos eran los adecuados por ser semillanos para la construcción de la torre.

(9) Finalmente concluyó la Sala que el demandante en ningún momento antes de haber descubierto el error Delgado Márquez informó al demandado o a sus agentes, empleados o abogados, ni actuó en forma que fuera incompatible con la creencia errónea que tuvo el demandado de que fuera el demandante dueño de y que podía obligarse a vender 5.1 cuerdas altillanas en el punto más alto del cerro "La Marquesa", y que como cuestión de hecho real y positivo existe. en este litigio un error sobre la substancia de la cosa que fue objeto del contrato derivado de actos desconocidos para el obligado voluntariamente a contratar. La Sala sentenciadora realizó una inspección ocular.

Con las anteriores determinaciones de hecho, concluyó la Sala como cuestión de derecho que el contrato que aparentemente surgió a la vida legal cuando el demandado hizo uso de la opción para adquirir las 5.1 cuerdas de terreno del demandante a tenor de lo estipulado en la opción del primero de agosto de 1952 es nulo y no obliga al demandado ya que éste dio su consentimiento por error, recayendo dicho error tanto en la identidad como en los atributos o caracteres esenciales de la cosa objeto del contrato. Declarado nulo el contrato determinó que las partes venían obligadas a restituirse recíprocamente las prestaciones que hubiesen realizado una a favor de la otra; declaró sin lugar la demanda, con lugar la contrademanda y condenó al demandante a satisfacerle al demandado la cantidad de $2,500 que le había pagado como precio de la venta.(¹)

El recurrente sostiene ante nos que la Sala sentenciadora cometió error al aplicar a los hechos de este caso los artículos

---

(¹) La Sala sentenciadora hizo constar expresamente que se había dejado para otra vista, de ser necesario, la prueba relacionada con la construcción de una carretera en la finca del demandante Capó Caballero. También hizo constar que era innecesario considerar y resolver otros fundamentos de nulidad alegados por el demandado en su contestación. Uno de estos fundamentos de nulidad, consistente en que el demandante no podía conceder válidamente la opción por tratarse de una propiedad ganancial, no se sostiene a la luz del récord, ya que, aparte de la naturaleza del derecho envuelto antes de aceptarse la opción, se probó con la declaración en corte de ambos esposos que la esposa tenía conocimiento de las transacciones que se estaban realizando, se discutieron ante ella, nunca manifestó reparo alguno, y en adición, en el proyecto de escritura que sometió el demandante al demandado ella comparecía también como vendedora. Otro fundamento de nulidad que tampoco se sostiene a tenor del récord es que la opción se hizo sobre cosa indeterminada e incierta. Si bien en el texto de la opción no se describió la parcela de 5.1 cuerdas ya deslindada, la localización específica quedó a determinarse por las partes en el sitio convenido. El otro fundamento de nulidad alegado es el de que el cumplimiento de aquella parte relativa a la localización y extensión de la carretera a ser construida hasta el predio a adquirirse se dejó al arbitrio y determinación exclusiva del demandante y que constituía una obligación imposible de cumplir o cuyo cumplimiento hubiese resultado extremadamente oneroso. En vista de que se dejó para una ocasión posterior el recibir prueba en lo relativo a la construcción de la carretera, no expresaremos criterio sobre el particular.

1218 y 1221 del Código Civil, e impugnó además algunas conclusiones de hecho de la Sala sentenciadora que alega no están sostenidas por la prueba. No es preciso considerar lo relativo al artículo 1221 ya que la Sala sentenciadora no basó su fallo en la existencia de dolo, y a la luz de la prueba y de la doctrina aplicable no nos parece que hubiera tenido fundamento para ello.

Rigen este litigio particularmente los artículos 1206, 1217, 1218, 1254 y 1340 del Código Civil (ed. 1930).(²)

Se ha de resolver si sobre los elementos determinantes del negocio jurídico hubo en este caso un error esencial, de hecho, —"*error in re*", "*in corpore*" sobre la identidad de la cosa objeto del contrato o "*in sustantia*" sobre su esencia o cualidades sustanciales, o como mejor define este último el Profesor Ruggiero, "error que versa sobre la esencia de la cosa o sus propiedades que se consideran, en concreto, como esenciales al destino económico y a la función social de una cosa; en otros términos, un error sobre cualidades del objeto, que objetiva o subjetivamente determinan su función";(³) —

---

(²) *1206—31 L.P.R.A. sec. 3371*—"El contrato existe desde que una o varias personas *consienten* en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio."

*1217—31 L.P.R.A. sec. 3404*—"Será nulo el *consentimiento* prestado por error, violencia, intimidación o dolo."

*1218—31 L.P.R.A. sec. 3405*—"Para que el error *invalide el consentimiento*, deberá recaer sobre la sustancia de la cosa que fuere objeto del contrato, o sobre aquellas condiciones de la misma que principalmente hubiesen dado motivo a celebrarlo."

. . . . . . . . .

*1254—31 L.P.R.A. sec. 3513*—"Pueden ejercitar la acción de nulidad de los contratos los obligados principal o subsidiariamente en virtud de ellos. Las personas capaces no podrán, sin embargo, alegar la incapacidad de aquéllos con quienes contrataron; ni los que causaron la intimidación o violencia, o emplearon el dolo o *produjeron el error*, podrán fundar su acción en estos vicios del contrato."

1340—31 L.P.R.A. sec. 3747—"La promesa de vender o comprar, habiendo conformidad en la cosa y en el precio, *dará derecho a los contratantes para reclamar recíprocamente el cumplimiento del contrato.*"

. . . . . . . (Bastardillas nuestras.)

(³) Roberto de Ruggiero, *Instituciones de Derecho Civil*, 4ta. ed. anotada, Vol. 1, pág. 268.

que viciara la formación de la voluntad y diere lugar a la anulación o a la inexistencia del negocio. (⁴)

Estamos ante un problema de la voluntad de difícil manejo. Como nos dice Don José Castán en cuanto al error sobre la sustancia, expresando lo que simplemente no es sino un sentir general en la doctrina, "la apreciación de esta clase de error suscita problemas difíciles, por la variedad de puntos de vista, objetivos y subjetivos, desde los que puede ser contemplado, y por las confusiones a que se presta el deslinde entre el error subjetivo sobre las cualidades o condiciones de la cosa, que da lugar a la nulidad del contrato, y el mero error sobre los motivos, que no produce efecto alguno."— Castán, *op. cit.*, pág. 359—; u otros errores, añadimos nosotros, secundarios o accidentales que no vician. Lo ha reconocido así en más de una ocasión el propio Tribunal Supremo de España—"no obstante las graves dificultades y largas polémicas que ha suscitado el concepto y la doctrina del error *'in substantia'*, que la generalidad". . . .etc.—Sentencia de

_____ ___ __

(¹) Bajo nuestro ordenamiento civil que en este sentido sigue la tradición romana no obstante ciertas tendencias más modernas—véase en cuanto a éstas la exposición en De Gásperi, *Tratado de las Obligaciones en el Derecho Civil Paraguayo y Argentino*, Vol. 1, págs. 505 a 512 y el criterio de otros tratadistas como De Buen y Alberto Blanco.—sólo el error *de hecho* se aprecia. El Código no menciona por separado aquél que versa sobre la identidad de la cosa, el que confunde una con otra *"aliud pro alio"*, pero al igual que el error sobre la sustancia, la doctrina y la jurisprudencia lo tienen reconocido como vicio de la voluntad. Castán lo equipara al error *"in negotio"*, otro error de hecho, (si bien algunos como Valverde lo consideran de derecho), en cuanto a que como en aquél, el error sobre la identidad según expresa destruye aquí la declaración de la voluntad e impide que se forme el acto jurídico, produciendo inexistencia, a distinción del error sobre la sustancia que bajo el Artículo 1300 del Código Civil español produce la condición de anulable. Savigny le atribuye igual consecuencia al error *"in corpore"*. El propio Castán anota, sin embargo, que el Tribunal Supremo de España no hace pronunciada diferencia entre el error sobre la identidad y el error sobre la sustancia de la cosa, dándole el mismo trato de anulabilidad. Castán, *Derecho Civil Español Común y Foral*, Tomo 3, 8va. ed., págs. 357-360. Ante la particular cuestión litigiosa en el caso de autos, no hace diferencia el que el vicio conduzca a la inexistencia del acto o falta de realidad jurídica como si no hubiere habido consentimiento o, habiéndolo con vicio, a su anulación bajo el artículo 1252 del Código Civil, —31 L.P.R.A. sec. 3511.

14 de junio de 1943—, estableciendo ciertos postulados básicos a los que habremos de referirnos más adelante. Para apreciación tan compleja es de rigor una minuciosa incursión en los hechos ocurridos, y de acuerdo con el récord ante nos, hay que convenir en que las conclusiones de hecho expuestas por la Sala sentenciadora no comprenden hechos indisputables que a la luz de la doctrina a ser aplicada ofrecen elementos de juicio esenciales para determinar, como lo determinó ella, si procede la anulación del contrato. Esto nos impele a hacer una exposición de la prueba.

Declaró el ingeniero Angel del Valle como testigo del demandado que en junio de 1952 él trabajaba para Ramos en la W.K.A.Q. y éste le pidió que viera unos terrenos que llamaban "La Marquesa", en Aguas Buenas, a ver si el testigo creía que servían para poner la torre de televisión. Vio los terrenos y le informó a Ramos que él creía que aquel era un sitio ideal porque se veía San Juan y muchos pueblos desde arriba. Ramos le preguntó qué sabía de ese monte y el testigo le dijo que el monte pertenecía a un señor de apellido Capó muy amigo de su hermano Manolín. Se comunicaron con Manolín y Ramos y del Valle visitaron a Capó en su oficina unos días antes de junio 22, (fecha de la primera opción) a ver si estaba interesado en vender una parte de los terrenos del monte ese. Hablaron del propósito de la compra de parte del monte y que deseaban la parte alta, de donde se veían San Juan y otros pueblos, mientras más alto fuera, mejor. El testigo inquirió si había terreno para hacer un edificio y Capó dijo que había espacio para un edificio además de la torre, que tenía una parte llana, que en la parte llana no había muchos árboles y existía bastante terreno para hacer los edificios. Capó entonces invitó a del Valle a ver el monte más de cerca y dos o tres días después éste lo visitó en su finca donde observó el monte desde la sala de la casa. Hablaron de nuevo sobre los pormenores ya dichos, el testigo le preguntó en cuanto a la placa de Estados

Unidos allí y Capó le dijo que había estado en varias ocasiones en el punto donde está la placa y que era en su terreno, que aquello allá arriba se veía llano y se veían muchos pueblos.

En agosto 9, 1952 (aún no se había aceptado la opción en agosto 22), el testigo volvió a la finca con el Lic. González, abogado del demandado, para subir al monte. El Lic. González permaneció abajo en el automóvil y Capó y el testigo empezaron a ascender el cerro. El día estaba lluvioso y el terreno resbaladizo haciendo difícil la ascensión por ese sitio. Caminaron 18 a 20 minutos, comenzó a llover, el testigo inquirió si tenía mucho que caminar a lo que Capó contestó que había que dar vueltas largas para llegar a un llano allí arriba, el testigo insistió en ver el llano del monte y Capó le dijo que eso allá arriba existía y como estaba lloviendo volvieron a descender. Al llegar al automóvil donde estaba González se habló en términos generales de la compra de la parcela y del camino, que Capó dijo podía costar dieciocho mil dólares y el testigo calculó que de cuarenta a cincuenta mil. Como una semana más tarde Oviedo le pidió al testigo que llevara una carta y un cheque a Capó, fechada 22 de agosto, lo cual hizo. Después de eso no lo volvió a ver. Dijo que Capó nunca le entregó un plano de la finca, ni tampoco él se lo pidió. También, que no había llevado al monte un altímetro ni instrumento de clase alguna.

En la repregunta declaró que Ramos lo había mandado a ver si del monte, que se había visto desde otra parte, se podía ver a San Juan y otros pueblos. Preguntado si no había ido a ver el monte para informarle a su jefe, dijo que no lo vio, que sobre la altura que era su interés principal Capó le informó y "yo miré el monte y yo veía que era alto el monte. Yo no tenía que ver el monte para determinar que el sitio era ideal para nuestro propósito, porque se veía la ciudad de San Juan y tenía la parte más llana arriba." P.—¿Yo debo entender que para usted no era necesario estar arriba en el monte para poder determinar que el sitio le

servía para el propósito de ustedes? R.—Para mí no era necesario, porque no era una cosa nueva, porque yo había estado por la parte de atrás del monte, y había podido verlo por detrás del monte, yo había estado en la urbanización que hay, que fue hecha por el señor Santaella, y desde allí al lado yo veía la ciudad de San Juan, y yo tenía en mente lo que se podía ver desde el monte." Siguió declarando el testigo que él había sido enviado por Ramos o su abogado porque querían ver el sitio exacto en donde se iba a poner la estación y querían tener la certeza de que el sitio estuviera en la parte más alta para que cubriera más terrenos. No llegó al sitio exacto en donde iban a poner la estación, en primer lugar porque no podía subir por donde iban; en segundo lugar porque estaba lloviendo. Hasta donde llegó calculó "que era un sitio bueno, y que allá arriba era un llano." P.—¿Y usted me dice a mí que usted nunca estuvo en el sitio preciso donde decía que era ideal para la instalación de la estación? R.—No estuve. Yo no estuve. El Lic. González que era el abogado del señor Ramos me autorizó para comprar y él estuvo en la finca." A una aclaración que pidió la Sala expresó el testigo que habló con González en términos generales para González aceptar la opción, y él le estaba dando su opinión si servía o no servía el sitio porque ya se había determinado el sitio; allí lo que estaban viendo era lo que iban a comprar. A preguntas de si a él no le interesaba saber la altura del monte:—"Nosotros teníamos ya en nuestra oficina la altura oficial que había cubierto el monte, pero realmente yo no la busqué, pero que existen todos esos detalles desde que empezamos a pensar en el monte . . . como yo era ingeniero electricista y los otros eran ingenieros civiles. . . P.—¿Y a usted no lo mandaron a ver el monte? R.—Sí, para ver mi opinión. P.—¿Y usted ni siquiera inspeccionó el monte? R.—No llegué a subir arriba." Dijo no haber visto la cerca de la colindancia del demandante en el monte. Por la altura a que subió no sabía en absoluto

a qué altura estaba. Finalmente manifestó el testigo que Capó nunca puso objeción al demandado o a sus empleados a que entraran en la finca.

El propio demandado declaró que a principios del 1952 empezó a gestionar un permiso para la construcción de una torre de televisión. Un empleado de la Autoridad de Comunicaciones le dijo que el sitio más alto y accesible en todos aquellos alrededores eran los terrenos del cerro "La Marquesa". Le trajo el libro del Departamento Federal de los Estados Unidos mostrándole las triangulaciones o puntos más altos y le enseñó el de *"La Marquesa Hill"*. Vio, desde el punto técnico, que era más o menos el sitio más alto a 12 ó 15 millas de San Juan, porque una estación de televisión no podía estar más lejos del área. Le pidió a del Valle que investigara de quién era la propiedad y éste le dijo que su hermano Manolín era muy amigo de Capó, dueño de la misma. Manuel del Valle y Capó hablaron, y Ramos supo que Capó estaba dispuesto a vender a $500 la cuerda. Se fue a Europa a mediados de junio y dejó al Lic. González encargado de la parte profesional y a Angel del Valle de la parte mecánica. El 21 de agosto de 1952, estando en Europa averiguó que la opción iba a vencer y pidió a González que le comunicara los términos de la misma. A otra comunicación de González le contestó *"do your best"* y autorizó que se ejercitara la opción. Regresó a Puerto Rico en septiembre. En abril de 1953 se reunió con Capó, los abogados de ambas partes, Oviedo y Delgado Márquez y todo fue cordial. En mayo 1ro. de 1953 el ingeniero Rafael Delgado Márquez empezó a trabajar con él como Administrador de la televisión. Estando en Estados Unidos lo llamó Delgado Márquez informándole que "el sitio ese no lo conseguimos en la finca del señor Capó". Le dijo que estaba en los de Ortiz Toro. Pidió a Delgado Márquez que llamara a Ortiz Toro "[P]orque yo me di cuenta que en la solicitud de nosotros que habíamos hecho a la Comisión Federal de Comunicaciones el sitio del señor Capó no

correspondía a los hechos." Manifestó no haberle pedido a Capó las coordenadas de la parcela objeto de la opción.

En la repregunta Ramos declaró que la R. C. C. había asignado tres canales para San Juan: 2, 4 y 6; hubo conversaciones con la estación del gobierno para usar la misma torre lo cual él creía de su experiencia que era posible; que la carretera del gobierno empezó a construirse en abril o mayo de 1953; no había carretera cuando aceptó la opción; él no aportó dinero para la construcción de esa carretera pero le suministró al gobierno, en mayo o junio de 1953, un estudio que él había hecho sobre las ventajas.

La versión de estos hechos según los declaró el demandante fue la siguiente: Manuel del Valle lo llamó para informarle que Ramos tenía interés en adquirir de él un pedazo de terreno para construir una torre de televisión, a lo cual él estuvo dispuesto a base de $500 la cuerda y otras consideraciones que serían estipuladas. Al otro día Angel del Valle fue a su oficina a pedirle una opción a favor de Ramos sobre cinco cuerdas. Le dijo que había visto su finca. El testigo preparó la opción que examinó su abogado y luego envió al Lic. González con el propio del Valle. Al día siguiente de la opción del Valle le pidió un plano de la parcela y las coordenadas del punto más alto de su finca a lo cual le respondió que nunca las había tenido en sus manos y que él no podía hacerlas porque no era ingeniero. En cuanto al plano de la parcela le explicó que aún no se había aceptado la opción y deslindado ésta, y le ofreció un plano de la finca que dijo haberle entregado. Un día después de esta conversación Ramos lo llamó para pedirle de nuevo las coordenadas, porque tenían que radicar la solicitud con las coordenadas del punto más alto. Al informarle el testigo que no las podía suministrar Ramos le dijo que usarían las mismas del *"bench mark"*, el punto establecido allí en una parte del cerro "La Marquesa". El testigo le informó que ese punto no estaba dentro de la finca, que su finca estaba toda cercada y el punto

estaba fuera, a lo que Ramos dijo que enviaría la solicitud con las coordenadas del *"bench mark"*, iba a dar una idea en la solicitud y después eso se podía arreglar. Posteriormente hubo una reunión en que se habló de la torre, de las líneas de electricidad, el agua y la carretera. Días después González le pidió una prórroga por no haberse podido comunicar con Ramos en Niza, y se firmó la nueva opción. Para esa época la carretera que actualmente conduce a la torre no había sido construida. La torre de televisión se edificó a un metro de la cerca que divide los terrenos del testigo de los de Ortiz Toro, y una esquina de dicha cerca fue destruida con la "puerca" al hacer la planicie para la estructura. Además de la visita de del Valle y del Lcdo. González, antes de aceptarse la opción estuvieron en su finca Casenave a tomar fotografías de todo aquello, y un norteamericano.

En la repregunta dijo que como cuestión de hecho el punto más alto del cerro no estaba en su finca la cual colinda con Ortiz Toro en la "cuchilla" del monte, y sus terrenos allí eran más o menos como los de Ortiz Toro; que Angel del Valle solicitaba el punto más alto de su finca, tenía escogido el sitio y le habían informado que era del testigo. En cuanto a lo que ocurrió al subir al monte acompañado de del Valle, declaró Capó que no llovía, al llegar a 50 pies de arriba desde allí daba un poco de trabajo subir, del Valle sacó el altímetro, viró para atrás y dijo: "Con eso basta". "Aquí da la altura". Desde ese sitio se veía la cerca y él le señaló la cima de su finca en la cumbre del cerro, la cual ocupaba una parte del lado norte.

El *Exhibit* 2 del demandado es un documento titulado "Engineering Report Re Application of El Mundo Broadcasting Co. San Juan, Puerto Rico. For Television Broadcast Station Channel 2-100 KW-20 DEC-1279 feet. June, 1952". Es la solicitud acompañada de un estudio con abundante información técnica para la construcción de la estación televisora. Se hace constar en dicho documento que el sitio

del propuesto transmisor es en el Cerro "La Marquesa" como a 12 millas al sur de San Juan, según se indica en el cuadrángulo topográfico unido. Las coordenadas geográficas de dicho sitio son 18 grados, 16 minutos, 53 segundos latitud norte y 66 grados, 6 minutos, 46 segundos longitud oeste, a 1673 pies de elevación sobre el nivel del mar. El informe contiene 4 fotografías del cerro tomadas en 1952, dos mirando hacia el suroeste desde distintos puntos, una hacia el norte y otra hacia el sur. En todas las fotografías aparece señalada la ubicación de la torre en el sitio determinado en las coordenadas dichas. Este documento está jurado y suscrito en Washington, D. C. en junio 26 de 1952.

El ingeniero Rafael Delgado Márquez declaró como testigo del demandado que para la época él era Administrador General de la W.K.A.Q. a cargo de la construcción de la torre. En mayo de 1953 fue al terreno a localizar el punto deter minado ahí. Expuso que esos puntos ya estaban de antemano establecidos para la televisión descritos por sus coordenadas, inscritos en el terreno por la Comisión Federal de Comunicaciones. El testigo llevó consigo el *Exhibit* 2 del demandado o sea la solicitud e informe pericial, y otro documento llamado "Triangulación en Puerto Rico"—*Exhibit* 3 ddo.—publicado por el Departamento del Interior de los Estados Unidos en combinación con el Departamento de Obras Públicas de Puerto Rico, con las coordenadas geográficas, a fin de determinar el punto, y además llevó copia de un plano de la finca— *Exhibit* 1 ddo.—que Ramos le había sometido con la solicitud. Con dichos documentos logró en seguida la localización del punto en que se debía enclavar la torre, que era exactamente el punto de triangulación ya establecido. Las coordenadas fijadas en la Triangulación daban exactamente las mismas coordenadas expresadas en la solicitud del demandado para la estación televisora. Para localizar fácilmente el punto siguió las instrucciones del panfleto de triangulación y encontró que dicho punto estaba marcado con una placa a unos

200 metros al oeste de la finca de Capó, fuera de su colindancia.(5) El cerro "La Marquesa" tenía por el este tres puntos al mismo nivel. Dos quedaron rebajados después de la construcción. Medida la cantidad de terreno plano en este sitio, resultaba bastante escaso. El cerro se extiende en longitud de oeste a este con una especie de llanura muy limitada o camino en el centro del lomo. La parcela de Capó estaba en la vertiente del camino o lomo. Técnicamente no hubiera sido imposible construir la torre en los terrenos de Capó pero hubiera sido sumamente costoso, no prácticamente imposible.

En la repregunta Delgado Márquez manifestó que para determinar que el punto fijado para la torre que habían puesto en la solicitud no estaba dentro de la finca de Capó no le tomó ningún tiempo; ir al sitio y nada más. La finca estaba cercada. Bastaba con subir allí. La torre se iba a localizar en el punto determinado por el gobierno federal, el único punto allí que estaba sujeto a ponerse la torre. Los 200 metros mencionados no variaban el punto ni en grados, ni en minutos ni en segundos, Puerto Rico está en el 66/18, era cosa de nada. La estación no se edificó en el punto más alto marcado por el gobierno. Este estaba aproximadamente a 250 metros de la finca de Capó, y la torre se construyó a dos metros más o menos de la colindancia de la esquina más cerca. Dos patas de la torre medían 13 pies de altura y las otras dos 41 pies. Se propuso que se usaran los terrenos de Ortiz Toro porque tenían la meseta y de colocarse las patas en la vertiente de Capó costaría mucho dinero. Manifestó

(5) Surge de la declaración del testigo y se desprende del Acta de la inspección ocular que la finca del demandante de hecho llegaba hasta la cumbre del monte. Estos 200 metros no estaban más arriba de la colindancia en dirección ascendente, sino fuera de la colindancia pero hacia un lado, en un nivel topográfico que resultaba ser prácticamente igual, si bien el punto mismo marcado en la triangulación quedaba un puntito más alto. De hecho, y sin que del récord aparezca la explicación, la torre no se construyó en el puntito más alto ya marcado y fijado en la solicitud, sino en otro un poco más bajo aunque más o menos del mismo nivel.

el testigo que el gobierno hizo una carretera que llega hasta la parte más alta del cerro y termina allí, de la cual ya había parte construida al empezarse a construir la estación y permitía a Ramos mover el material. Al comenzar a trabajar en mayo, supo que ya había un acuerdo entre Ramos y funcionarios del gobierno de que se iba a hacer esa carretera que daba acceso a "La Marquesa". La carretera está de 50 a 60 metros de la finca de Capó en la parte más alta. Manifestó el testigo que conocía los términos de la opción en lo referente a la construcción de una carretera, pero sabía también que el gobierno iba a construir una. ([6])

El Acta de inspección ocular confirma la declaración del ingeniero Delgado Márquez en lo referente a la topografía del terreno donde se edificó la torre así como en cuanto a la colindancia de la finca del demandante con dicho terreno. (Véase ilustración del *Exh.* 2do. pág. 24.) *

Hasta aquí, lo que revela el récord.

 Sabido es que la declaración de voluntad es el alma y esencia misma del negocio jurídico, pero ha de ser una vo-

---

([6]) Declararon también los abogados de las partes, pero sus testimonios versan primordialmente sobre hechos que les fueron informados por del Valle y por Capó.

\* PERFIL DE LA CIMA DEL CERRO "LA MARQUESA" TOMADO DE FOTOGRAFÍA.. DEL EXH. 2 DEL DDO. MIRANDO HACIA EL SUR.

(a) Situación de la torre en la solicitud, punto 18 grados 16 minutos 53 segundos, lat. norte; 66 grados 6 minutos 46 segundos long. oeste. 1673 pies de elevación.

(b) Sitio más o menos en que de hecho se construyó la torre.

(c) Colindancia oeste más o menos de la finca del demandante.

luntad inteligente y consciente, además de libre; ni deformada ni anormalmente formada. En tanto el error afecta el contenido de la voluntad y su formación, ésta no es consciente ni inteligente y de ahí que, como dicen Colin y Capitant, (⁷) contra la concepción jurídica primitiva del derecho romano en que la fórmula del contrato era lo único que importaba, no dejándose sitio para el error, surgió la teoría más equitativa del "respeto a la voluntad del contratante".

■■■■ De acuerdo con los tratadistas, el error que crea nulidad relativa (anulabilidad del negocio) según el criterio prevaleciente, —la inexistencia inclusive, en determinados casos para algunos, —es un error de hecho esencial que constituye, según los textos, una representación falsa o inexacta de la realidad; creer verdadero lo que es falso, o a la inversa; el conocimiento falso o equivocado de una cosa o de un hecho, por incompleto o inexistente; el defecto de la correcta representación en la formación de la voluntad, la noción falsa o el concepto equivocado; "disconformidad o discordancia entre nuestras ideas y la naturaleza de las cosas", en el Diccionario de Derecho Usual. Borell y Soler (⁸) más conceptuosamente dice que el error de hecho "es la falta de ecuación entre una cosa y el conocimiento que tenemos de la misma. Puede recaer en la percepción de la misma cosa, en el juicio que nos formamos de ella y en el raciocinio, si el error recae en algunas de las premisas. . . El error de percepción, en este caso, consiste en tomar una cosa por otra; el de juicio, en atribuirle condiciones de que carece o en desconocer las que tiene;"(⁹). . . Véase: O. Lenel, El *"error in substantia"*

(⁷) *Curso Elemental de Derecho Civil*, Tomo 3, 3ra. ed., págs. 636, 637. Y véase Sentencia del Tribunal Supremo de España de 5 de marzo de 1960 (Aranzadi).

(⁸) *Nulidad de los Actos Jurídicos*, pág. 219.

(⁹) Discurriendo sobre los vicios del consentimiento nos dice Mucius Scaevola—*Código Civil*, Tomo 20, pág. 618, et seq—que ofrecen una naturaleza psíquica o psicológica en cuanto al ánimo y a la mente del que contrata; un estado anormal de la voluntad ya ocurra por un juicio falso del propio sujeto o por elemento ajeno, o por acción dolosa. Y considerando

Tomo 11, Revista de Derecho Privado, pág. 97 (traducción).
Se trata del error llamado propio o error.vicio por los tra-
tadistas, en el contenido o formación de la voluntad, a dis-
tinción del llamado error impropio, la discordancia entre
la voluntad declarada y la voluntad interna o real o como
dice Ruggiero, *op. cit.* pág. 263, entre el querer interno y su
manifestación, que según la opinión de algunos puede condu-
cir, no al vicio sino a la ausencia plena de consentimiento. ([10])

■ El error de sustancia no recae sólo sobre la materia o
elementos de que se compone la cosa, sino también sobre aque-
llas cualidades o atributos de la misma que las partes tuvieron
particularmente en mira para contratar. Ha dicho el Tri-
bunal Supremo de España en su Sentencia de 14 de junio de
1943 antes mencionada, a la cual se le ha dado un señalado
despliegue, "Que tanto en el Derecho romano como en los
Derechos modernos, el reconocimiento del error substancial,
con trascendencia anulatoria del negocio, *tiene un sentido
excepcional muy acusado*, ya que, fundamentalmente, lo de-
cisivo para la existencia y eficacia del negocio jurídico es
que se declare una voluntad y que lo declarado se ajuste real-
mente a lo querido, *sin que los motivos que hayan decidido
a las partes a celebrar el acto puedan ejercer influencia al-
guna*, por regla general, sobre la validez de éste. (énfasis
puesto) . . . Que el Código español, más que cualquiera otro,
da destacado relieve al elemento subjetivo en la apreciación

---

el error como lo que es, creer falsamente sobre la cosa o que ésta posea
alguna cualidad de la que carece precisamente aquella que motivó el
contratar sobre ella, sigue exponiendo Scaevola que el error así es pura-
mente subjetivo, una descomposición del juicio humano al pasar sobre la
persona o cosa en que recae, y que de aquí, "el efecto jurídico del error;
porque debiendo los contratantes obligarse conscientemente o con plena
posesión de lo que se obligan, falta la conciencia cuando una de las partes
tiene un conocimiento equivocado acerca de algún elemento cardinal del
contrato, y se impone como conclusión fatal la nulidad de éste."

([10]) Heinrich Lehmann, *Tratado de Derecho Civil*, Vol. 1, págs. 371
et seq.; Castán, *op. cit.* Tomo 1, Vol. 2, págs. 537 et seq.; De Gasperi, *op. cit.*
págs. 512–514—concepto de Savigny y otros—; Betti, *Teoría General del
Negocio Jurídico*, págs. 311 et seq.; Puig Brutau, *Fundamentos de Derecho
Civil*, Tomo II, Vol. 1, págs. 103 et seq.

del error, pues al remitirse, en el Art. 1.266 ([10a]) a las condiciones de la cosa que . . . , bien claramente enseña que la justificación del carácter esencial del error ha de hacerse en relación con el objeto y cualidades especialmente tenidas en cuenta en el caso concreto;". . .

▆▆▆▆ Quedan todavía algunos postulados fundamentales que han de ser tenidos en cuenta al tomar decisión sobre la cuestión aquí litigiosa. Parten éstos del principio básico de orden público del "pacta sunt servanda"—los pactos se cumplen y tienen fuerza de ley entre las partes—, consagrado en nuestro régimen civil. *Arts.* 1208, 1219, 1230, 1231. Sobre este postulado de interés social, el que deba presumirse la validez del contrato y del consentimiento y no se presuma el error que lo vicia. Cf: *Diez* v. *Bascos*, 5 D.P.R. 97; *Mancheño* v. *Le Brun, et al*, 14 D.P.R. 474. Y que aun cuando recayere sobre cosa esencial, para que el error anule el negocio es preciso que aquél sea *excusable;* que derive de actos desconocidos del obligado sin que tal desconocimiento haya podido ser evitado con mediana prudencia o diligencia, que no sea imputable al que lo sufre; ni excusa el error cuando la ignorancia del verdadero estado de las cosas se debe a negligencia o a culpa de quien lo invoca. Tampoco puede invocarlo quien lo produce. Art. 1254, ante. Hay quienes sostienen, como Giorgi, que la inexcusabilidad se presume, o por lo menos la excusabilidad hay que probarla cumplidamente.

▆▆▆▆ Contra el anterior fondo doctrinal debemos enjuiciar los hechos en el récord. Ante casos concretos, como se ha dicho, al barajar elementos objetivos o subjetivos en la formación de la voluntad no siempre resulta fácil la apreciación. Analizando detenidamente los de este caso no dejan de surgir dudas sobre si a tenor de los mismos hubo aquí un error sobre la sustancia o la identidad de la cosa en sí, propiamente dicho, o si más bien pudo ser una confusión inexcusable en cuanto a qué persona era dueña del sitio ya fijado por el

---

([10a]) Este artículo y el 1218 nuestro son idénticos.

demandado en donde habría de ubicar la estación. Pero el error sobre la persona no crea vicio de consentimiento a menos que se contrate con miras a ella o sus cualidades o atributos personales. Art. 1218 Código Civil. Siguiendo, no obstante, el principio bien afincado en la jurisprudencia española que la existencia de error presenta una cuestión fundamental de hecho y corresponde esencialmente a los tribunales de instancia el determinarlo según aprecien la prueba, (aunque se ha dicho también que entraña a la vez un concepto jurídico: Sentencias de 31 de enero de 1950 y 5 de diciembre de 1953); habremos de asumir, con la Sala sentenciadora, que hubo error. Aún así, y sin que intervengamos en nada con la manera en que la Sala dirimió conflictos de evidencia y dio crédito al testimonio, más bien echando a un lado la prueba del demandante, por los hechos indisputables que surgieron de la del propio demandado no sería sostenible el fallo invalidando el contrato a la luz de las normas de derecho aplicables.

En primer lugar, la existencia de "altillanuras" en la cumbre del cerro y de terreno "llano o semillano" a que se refieren las conclusiones de hecho de la Sala, a lo cual se ve que dio mucho peso, resulta un concepto un tanto ponderado. Según la declaración del ingeniero Delgado Márquez allí todo lo que había en este sentido era un lomo a lo largo de la cumbre del cerro, que lo llamó "camino", o llano de muy escasa medida. La propia Sala expresó en el Acta de inspección ocular que la torre estaba instalada más o menos sobre una meseta natural con ayuda artificial después de haberse nivelado el terreno, que todo lo que había encontrado alrededor de la torre eran terrenos que bajaban precipitadamente formando grandes riscos; la meseta donde ubicaba la torre era lo único llano, y era bien poco, entre todos los terrenos que veía. Aun en la parte del cerro que fue utilizada, de Ortiz Toro, dos patas de la torre medían 13 pies y las otras dos 41 pies según dijera Delgado Márquez, teniendo

lógicamente que haberse construido éstas en una vertiente bastante precipitada que no era la que correspondía al demandante. Hay que concluir que las llamadas altiplanicies o terrenos llanos allí no eran siquiera lo suficientemente anchos para cubrir el área de la base de la torre misma, a pesar de la obra de nivelación.

En segundo lugar, son hechos indisputables que para la fecha en que comenzaron las primeras gestiones y se dio la opción de 24 de junio de 1952 el demandado ya sabía el sitio en donde debía erigir la torre con sus coordenadas geográficas y la altura requerida, porque así se lo habían informado y mostrado en la Autoridad de Comunicaciones con el libro oficial de triangulación y así también se había hecho constar en la solicitud e informe técnico que hiciera ante la Comisión Federal. (Ddo. *Exh*. 2.) Era la parte demandada y no el demandante quien poseía la información específica y los conocimientos necesarios en cuanto a la ubicación y construcción de dicha torre. En momento alguno Ramos le informó a Capó que él necesitaba el sitio que tuviera la localización geográfica exacta que daban las coordenadas aludidas a una elevación de 1673 pies.[11] Por el contrario negó haberle solicitado a Capó las coordenadas geográficas de la finca, y del Valle negó que le hubiera pedido un plano de la misma.

El demandado sabía desde un principio el punto que necesitaba, y pudo haber constatado, antes de aceptar la opción y obligarse usando los datos técnicos en su poder, lo que Delgado Márquez constató posteriormente con esa información. Al igual que Delgado Márquez, fácilmente hubiera comprobado en ese entonces que el sitio en cuestión no estaba dentro de la finca de Capó la cual aparecía debidamente cercada. Por otra parte, quedó establecido mediante el *Exh*. 2 y la declaración de Delgado Márquez reafirmada en cuanto

---

[11] Guillermo Borda llama a esto un error *"in mente retenta"* que es inexcusable. *Tratado de Derecho Civil Argentino*—Vicios de los Actos Jurídicos, Tomo 2 págs. 260 et seq.

a este extremo por el Acta de inspección ocular, que la finca del demandante llegaba hasta la misma cima del cerro cubriendo parte de la ladera norte del mismo. Según comprueba el *Exh.* 2, el requisito de altura por razones técnicas de la radioemisión era la cualidad o condición esencialmente envuelta, y es un hecho que la torre quedó a escasamente dos metros de la cerca del demandante. No se utilizó el punto mismo fijado en la solicitud marcado por el Gobierno federal, sino un sitio a 250 metros de distancia y de un nivel un poquito más bajo. Resulta obvio que el problema del demandado no fue tanto el que la finca del demandante no contuviera dicho punto específico, como el de un costo de edificación considerablemente mayor de haber utilizado los terrenos de éste.(12)

Estos hechos indisputables, que aparentemente la Sala sentenciadora no tomó en cuenta, nos llevan a disentir de su criterio y nos convencen que el error, de existir, no versó sobre hechos desconocidos por el demandado o que no hubiera podido conocer con un mediano cuidado; se debió a su negligencia o culpa y no fue un error excusable. Véase: *Miró* v. *Comisión Industrial*, 57 D.P.R. 28, pág. 34 donde dijimos que el Administrador del Fondo no podía ejercitar la acción de nulidad por haber sido él el culpable del error de hecho. "Que aun cuando el Código Civil patrio no establece expresamente el requisito de que el error sea excusable", manifestó el Tribunal Supremo de España en la referida Sentencia de 14 de junio de 1943, "hay que entender, con nutrida doctrina científica, que un error que se haya podido evitar con una regular diligencia no puede ser invocado por el que haya incurrido en él para anular la declaración, o, cuando menos, que, según

---

(12) Durante este litigio el demandante ha hecho hincapié en que la razón del incumplimiento fue el hecho de la construcción de la carretera por el Gobierno, conocido por el demandado antes de construir la estación. Aunque no hay en el récord una total ausencia de prueba que permita inferir el planteamiento, no hay prueba convincente para un fallo sobre tales motivaciones.

expresó esta Sala en sentencia de 15 de enero de 1910, es mucho menos admisible el error 'cuando quienes contratan *son personas peritas o conocedoras del respectivo negocio'*; . . . . [énfasis puesto], criterio éste que aparece ratificado en la de 16 de diciembre de 1953 donde se dijo "[c]onsiderando que ha declarado esta Sala, entre otras sentencias, en la de 14 de junio de 1943, que no vicia el consentimiento el error que es inexcusable, carácter que tenía el invocado por el demandado, y en la Sentencia recurrida, porque estaba en la mano del que lo ponía el desvanecerlo con el examen en tiempo del documento de mandato o asesorándose debidamente". . . . . Véase también la de 23 de mayo de 1935: "Que cuando la disconformidad sea imputable al declarante, por ser maliciosa o por haber podido ser evitada con el empleo de una mayor diligencia, existiendo a la vez buena fe en la otra parte, se ha de atribuir pleno efecto a la declaración, a virtud de los principios de responsabilidad y de protección a la bona fides y a la seguridad del comercio jurídico, que se oponen a que pueda ser. . . y a que pueda ser alegada la ineficacia del negocio por la parte misma que es culpable de haberla producido."

*Por los fundamentos anteriormente expuestos se revoca la sentencia dictada en este caso por la Sala de Bayamón del Tribunal Superior y se dictará otra decretando la validez y cumplimiento del contrato, desestimando la contrademanda, y en lo que respecta a aquella parte de la obligación relativa a la construcción de ciertas obras, se devuelve el caso a la Sala de instancia para que oiga prueba si así lo deseare cualquiera de las partes y resuelva lo que fuere de lugar, y si no procediere el cumplimiento específico, determine el "id quod interest" o resarcimiento a que hubiere derecho con arreglo a la ley aplicable.*